**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **JAMES ROBERT PITRE** | **CIVIL ACTION** |
| **VERSUS** | **NO. 20-2803-JVM** |
| **RHONDA LEDET, ET AL.** | |

**ORDER AND REASONS**

Plaintiff, James Robert Pitre, a state prisoner, filed the instant civil action against Rhonda Ledet and Shane Schwausch pursuant to 42 U.S.C. § 1983.[1] In the complaint, plaintiff stated his claims as follows:

> 6 Oct 2020 – The Terrebonne Justice Complex – TPCJC and its officers – Rhonda Ledet – Captain & Warden an[d] Thomas Schwausch – Lieutenant have violated my 1st Amendment Right to book. I have requested books many times over the past year. I have been denied for one reason or another. I have also requested to write to publishers to send me books, these requests have also been denied. Books have been banned and removed from the dorms for no reason, including religious materials. I was given a Bible from a warden at another facility, that Bible was confiscated. I am indigent. I have requested a Bible several times, I was denied. The churches donate Bibles for us, the TPCJC charges a fee for these Bibles. Prisoners have a first amendment right to read. Publishers and others have the same right to send us reading material.[2]

The defendants have filed a motion for summary judgment.[3] Plaintiff was ordered to file a response to that motion by no later than April 21, 2021;[4] however, he filed no such opposition. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).[5]

---

[1] Schwausch was identified in the original complaint as "Thomas Schwausch," Rec. Doc. 1; however, plaintiff later amended the complaint to correct the name to "Shane Schwausch," Rec. Doc. 4.
[2] Rec. Doc. 1, pp. 5-6.
[3] Rec. Doc. 18.
[4] Rec. Doc. 19.
[5] Rec. Doc. 17.

In their motion, the defendants argue that they are entitled to summary judgment based on their qualified immunity. "Qualified immunity shields government officials from civil liability in their individual capacity so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. It protects all but the plainly incompetent or those who knowingly violate the law." Cunningham v. Castloo, 983 F.3d 185, 190-91 (5th Cir. 2020) (citations and quotation marks omitted). Regarding an assertion of qualified immunity on summary judgment, the United States Fifth Circuit Court of Appeals recently explained:

> Qualified immunity changes the nature of the summary-judgment burden, how and when the burden shifts, and what it takes to satisfy the burden.
>
> A plaintiff suing for a constitutional violation has the ultimate burden to show that the defendant violated a constitutional right – that is, the plaintiff must make this showing whether or not qualified immunity is involved. But when qualified immunity is involved, at least in this circuit, a plaintiff has the additional burden to show that the violated right was "clearly established" at the time of the alleged violation.
>
> This expanded substantive burden isn't the only special feature of qualified immunity. Burden shifting changes, too. Under the ordinary summary-judgment standard, the party who moves for summary judgment bears the initial burden to show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The movant satisfies this burden by showing that a reasonable jury could not find for the nonmovant, based on the burdens that would apply at trial. For a defendant, this means showing that the record cannot support a win for the plaintiff – either because the plaintiff has a failure of proof on an essential element of its claim or because the defendant has insurmountable proof on its affirmative defense to that claim. The defendant can show this by introducing undisputed evidence or by pointing out an absence of evidence to support the plaintiff's case. If the defendant succeeds on that showing, the burden shifts to the plaintiff to demonstrate that there is a genuine issue of material fact and that the evidence favoring the plaintiff permits a jury verdict in the plaintiff's favor.
>
> But that changes with qualified immunity. When a public official makes a good-faith assertion of qualified immunity, that alters the usual summary-judgment burden of proof, shifting it to the plaintiff to show that the defense is not available. In other words, to shift the burden to the plaintiff, the public official need not show (as other summary-judgment movants must) an absence of genuine disputes of material fact and entitlement to judgment as a matter of law.

> Once the burden is on the plaintiff, things briefly sound familiar again: The plaintiff must show that there is a genuine dispute of material fact and that a jury could return a verdict entitling the plaintiff to relief for a constitutional injury. That would be the same if the plaintiff did not face qualified immunity. But, to overcome qualified immunity, the plaintiff's version of those disputed facts must also constitute a violation of clearly established law. This requires the plaintiff to identify a case – usually, a body of relevant case law – in which an officer acting under similar circumstances was held to have violated the Constitution. While there need not be a case directly on point, the unlawfulness of the challenged conduct must be beyond debate. This leaves the rare possibility that, in an obvious case, analogous case law is not needed because the unlawfulness of the challenged conduct is sufficiently clear even though existing precedent does not address similar circumstances.
>
> Moving from the bar to the bench, qualified immunity similarly changes the court's normal task on summary judgment. A court decides whether summary judgment is appropriate by viewing the facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor (so far normal), then determining whether the plaintiff can prove a constitutional violation (still normal) that was clearly established (not normal).

State *ex rel.* Estate of Joseph v. Bartlett, 981 F.3d 319, 329-30 (5th Cir. 2020) (footnotes, quotation marks, brackets, and ellipsis omitted).

In their motion, the defendants acknowledge that a policy was adopted prohibiting the distribution of physical books at the Terrebonne Parish Criminal Justice Complex,[6] but they explain that the policy is part of the facility's extensive efforts to combat the spread of COVID-19 in the jail. They further note that although a physical copy of the Bible was confiscated from plaintiff during an intra-facility transfer, the Bible was returned to him the following day. They also explain that, as an alternative to physical books, the facility has made available to inmates at no charge electronic tablets which feature a selection of reading materials, including the Bible. They argue that in light of the legitimate reason for the policy, as well as the alternative accommodations that were subsequently made available to provide all inmates with reading

[6] In their motion, the defendants indicate that the policy restricts access to "all available reading material from the TPCJC library" and "also affect[s] the purchase of approved Books from outside sources as well." Rec. Doc. 18-2, p. 3.

materials, including religious materials, their actions cannot be said to have constituted a violation of clearly established law.

In support of their motion, the defendants submitted an affidavit from defendant Ledet, in which she states:

> I am presently employed by the Terrebonne Parish Sheriff's Office as the Warden for the Terrebonne Parish Criminal Justice Complex. My duties include overall supervision for all employees at the complex as well as the care custody and control of the inmates housed in the complex. I hold the rank of Captain and, I was at all relevant times herein, in charge of the facility to ensure that all policies and procedures for the operation of the facility were followed, and that the safety and security for the employees as well as inmates were provided for, and that inmates receive all constitutional guarantees that they are entitled to within the law.
>
> In March 2020 our complex began receiving information about the COVID-19 pandemic from the Center of [sic] Disease Control (CDC) as to how to address health problems related to same. We continued to receive information from the CDC and we also reached out to the Louisiana Department of Corrections (DOC) for further guidance in dealing with this health issue.
>
> During the month of March 2020, we also ceased visitation for all public visits for inmates, with only attorney/inmate visits allowed.
>
> In April 2020 all staff and trustees working with inmates were required to wear masks and that policy continues to date. Beginning in April of 2020 and continuing to date, decontamination spraying of the entire facility began.
>
> Also, in April 2020 we were advised to further minimize contact between inmates in one Dorm with another, and the passing of library books to inmates was stopped as a way to minimize possible contact from contaminated inmates to inmates not having the COVID-19 virus. Zoom meetings with CDC and DOC, and the Louisiana Department of Health and Hospitals were held to gain additional information and recommendations to help combat the COVID-19 pandemic.
>
> In May of 2020 we began a system of trying to quarantine those inmates who had COVID-19 away from other inmates who did not, to the best of our ability, space limitations, and of course maintaining the proper classification level of inmates in the facility for the protection of the inmates.
>
> To-date all COVID-19 protocols continue and are updated by recommendations from the CDC, DOC, Louisiana Department of Health and Hospitals, as well as the Louisiana Sheriff's Association, and other sources. Our protection of the staff of the TPCJC as well as the inmates housed in same, continue to be a top priority as the health response to COVID-19 improves.
>
> In January of 2021 we introduced "Tablets" at no costs to the inmates into the complex for each inmate. Among other things on these "Tablets" for inmates to use, was a listing of numerous books for an inmate to read. While it took time to restore reading materials for inmates, these "Tablets" which costs the Sheriff's office significant funds, did restore reading materials while still working to combat

> the COVID-19 pandemic and to protect the health and safety of the inmates. In fact, in a response to an appeal of a Grievance by Plaintiff Pitre of September 23, 2020, I explained to him why books were not being passed and that I-pads (Tablets) were to be passed out. (Exhibit A-1a and A-1b)
>
> In February of 2021, Plaintiff Pitre was moved from Jail 2 to Jail 1. Among his personal items that he had at the time of the move were two or three Bibles. Inmate Pitre filed a grievance about the taking of the Bibles on February 3, 2021. His grievance was answered by Lt. Shane Schwausch, Grievance officer for the Complex, on the same day. A copy of said Grievance is attached to my affidavit as Exhibit A-2. Plaintiff Pitre was advised that there were questions about where he had gotten the Bibles, but that there were religious publications available on his "Tablet". Among such publications were Bibles.
>
> On February 3, 2021 Plaintiff Pitre again complained about his Bibles being taken. He received a response indicating that his Bible was to be returned. On February 4, 2021 Plaintiff Pitre acknowledged receiving a Bible back, but now indicates that he had three Bibles, not two, and wanted the other two bibles. He, Plaintiff Pitre received a response to that request that indicated that there was no indication of any Bibles being purchased by him while an inmate, and that he would only receive one Bible back. All of these grievances and responses are set forth on Exhibit A-3a and A-3b.[7]

The defendants also submitted an affidavit from Richard Neal, the jail's medical administrator. In his affidavit, Neal similarly recounts the COVID-19 precautions that were implemented at the jail. In addition, he expressly confirms that the precautions included a prohibition on "the passing of library books to inmates as same posed a possibility of transfer of the COVID-19 bacteria from inmate to inmate" and further states:

> I was advised in late November or early December of 2020 of the introduction of "Tablets" into the complex that would have reading material on them. I agree that such "Tablets" which would have library books on them to be a far better alternative to the library passes of actual books to inmates. To my knowledge such "Tablets" were introduced into the complex for inmates in January of 2021.[8]

In the instant case, the constitutional provision implicated by plaintiff's claims is the First Amendment. Regarding such claims, the United States Supreme Court "recognized in Turner [v. Safley, 482 U.S. 78 (1987),] that imprisonment does not automatically deprive a prisoner of certain

[7] Rec. Doc. 18-3.
[8] Rec. Doc. 18-7.

important constitutional protections, including those of the First Amendment." Beard v. Banks, 548 U.S. 521, 528 (2006) (plurality opinion) However, the Supreme Court went on to note that, although prisoners retain such rights, it must be remembered that "the Constitution sometimes permits greater restriction of such rights in a prison than it would allow elsewhere" and that "courts owe substantial deference to the professional judgment of prison administrators." Id. (quotation marks omitted). The Supreme Court then explained that "Turner reconciled these principles by holding that restrictive prison regulations are permissible if they are reasonably related to legitimate penological interests and are not an exaggerated response to such objectives." Id. (citations and quotation marks omitted). The Supreme Court also further observed:

> Turner also sets forth four factors relevant in determining the reasonableness of the regulation at issue. First, is there a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it? Second, are there alternative means of exercising the right that remain open to prison inmates? Third, what impact will accommodation of the asserted constitutional right have on guards and other inmates, and on the allocation of prison resources generally? And, fourth, are ready alternatives for furthering the governmental interest available?

Id. at 529 (citations, quotation marks, and ellipsis omitted).

Applying those Turner factors to the facts of the case at hand, this Court finds that the defendants' actions cannot be said to have violated clearly established law.

Regarding the first factor, the Court readily finds that there was a valid, rational connection between the jail's book policy and the legitimate governmental interest put forward to justify it (namely, to combat the spread of COVID-19 within the facility). Although "COVID-19 is thought to spread mainly through close contact from person to person, including between people who are physically near each other (within about 6 feet)," it is also thought to be possible to contract the disease "by touching a surface or object that has the virus on it and then touching [one's] own

mouth, nose, or eyes."[9] Moreover, of particular relevance here, the Centers for Disease Control expressly issued guidance concerning library use during the pandemic and advised that people should "[c]hoose digital over print materials, if possible."[10] Therefore, it cannot be fairly said that the jail's book policy was an "exaggerated response" to the pandemic.

Regarding the second factor, it must be noted that "[t]he absence of any alternative … provides some evidence that the regulations are unreasonable, but is not conclusive of the reasonableness of the Policy." Beard, 548 U.S. at 532. Here, however, jail officials worked to provide – **and did in fact provide** – a viable alternative for inmates seeking reading materials: free electronic tablets which gave all inmates access to numerous books, including the Bible.

Regarding the third factor, any accommodation which would have allowed inmates to continue to obtain and share physical books in the interim period before the tablets were secured would have defeated the policy's legitimate purpose to limit the possibility of COVID-19 spreading within the jail – to the detriment of both the staff and the inmates.

Regarding the fourth and final factor, as noted, a viable alternative was in fact found and utilized – a free personal tablet was provided to **each** inmate (thereby eliminating the need for any problematic sharing). Further, that alternative protected both the prisoners' ability to access reading materials and the defendants' ability to potentially reduce the spread of COVID-19 within the facility. Indeed, this was a rare occasion on which the alternative was clearly a "win-win" solution for **both** the inmates **and** their custodians.

For these reasons, it does not appear that the jail's book policy resulted in a deprivation of plaintiff's constitutional rights. Nevertheless, even if the policy were found to be unconstitutional,

---

9 https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (updated October 28, 2020).

10 https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/personal-social-activities.html#library (updated April 20, 2021).

plaintiff's claims would still fail for another reason: the defendants have raised the defense of qualified immunity, and plaintiff has not met his burden to overcome that defense. As already explained herein:

> [T]o overcome qualified immunity, the plaintiff's version of those disputed facts must also constitute a violation of clearly established law. **This requires the plaintiff to identify a case – usually, a body of relevant case law – in which an officer acting under similar circumstances was held to have violated the Constitution.** While there need not be a case directly on point, the unlawfulness of the challenged conduct must be beyond debate. This leaves the rare possibility that, in an obvious case, analogous case law is not needed because the unlawfulness of the challenged conduct is sufficiently clear even though existing precedent does not address similar circumstances.

State *ex rel.* Estate of Joseph v. Bartlett, 981 F.3d 319, 330 (5th Cir. 2020) (emphasis added; footnotes, quotation marks, brackets, and ellipsis omitted). Here, plaintiff has not even filed an opposition to the defendants' motion, much less made any attempt whatsoever to meet the foregoing burden the law imposes on him. He has not identified – and the Court has not discovered – a case or body of case law finding that a similar policy instituted in similar circumstances was held to be unconstitutional. Accordingly, the defendants are entitled to qualified immunity on these claims.

Lastly, to the extent that plaintiff is additionally claiming that the one-day deprivation of his physical copy of Bible violated his First Amendment right to exercise his religion, the Court flatly rejects that claim. As an initial matter, even without his physical copy of the Bible, he still had an electronic copy of the Bible available to him on his tablet. Moreover, in any event, the Court finds that a one-day deprivation of a religious text simply does not rise to the level of a constitutional violation. See e.g., Coward v. Captain Gonzales, Civ. Action No. 7:03-CV-139, 2009 WL 918637, at *9 (M.D. Ga. Feb. 24, 2009) ("An inmate's free exercise right does not depend upon his ability to pursue each and every aspect of the practice of his religion. Plaintiff's

claim against [defendant] is insufficient because his allegations did not suggest that the withholding of the religious materials for one day interfered with his ability to practice his sincerely held religious beliefs or that the withholding for one day of his religious bible study course denied him a reasonable opportunity to pursue his religion of choice. Therefore, to the extent Plaintiff claims a violation of his First Amendment right to freely exercise his religion, his claim should be dismissed." (citation and quotation marks omitted)). And, regardless, plaintiff has likewise failed to meet his burden to overcome the defendants' invocation of qualified immunity with respect to this claim.

Accordingly, for all of the foregoing reasons,

**IT IS ORDERED** that the defendants' unopposed motion for summary judgment, Rec. Doc. 18, is **GRANTED** and that plaintiff's claims are **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, this___5th___ day of May, 2021.

Janis van Meerveld

**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**